Michael E. Quiat, Esq.
Atty ID No. 015911985
USCHER, QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
Phone  201-342-7100
Fax     201-342-1810
**Attorneys for Plaintiff, Caryn Sanders**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

CARYN SANDERS,

      Plaintiff,

         vs.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, d/b/a
UNUM GROUP

      Defendant.

---

Civil Action No. _____

        ECF CASE

        COMPLAINT

---

Plaintiff, CARYN SANDERS, by way of Complaint against the Defendant, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY (hereinafter "Provident" or "Defendant'), alleges as follows:

1.     Plaintiff is a resident of Tel-Aviv, Israel, with a principal residence in Tel-Aviv, Israel.

2.     Defendant, Provident, upon information and belief, is now doing business as Unum Group (hereinafter "Unum"), a disability insurance carrier licensed to do business in the State of New Jersey with a principal place of business in Chattanooga, Tennessee.

3.      Jurisdiction and venue are proper in this Court pursuant to 28 USC §1332 and 28 USC §1391 in that the parties are residents of different states and the amount in controversy is in excess of $75,000.00.

## ESSENTIAL FACTS

4.      Plaintiff, Caryn Sanders (hereinafter referred to as "Ms. Sanders" or "Plaintiff"), is a 56-year-old woman who currently resides in Tel-Aviv, Israel. Prior to May 2016, Ms. Sanders was a resident of the State of Pennsylvania, County of Chester, where she had lived since 2004. Prior to 2004, Ms. Sanders had been a resident of New Jersey, Town of Edison.

5.      In 1990, while the Plaintiff was a resident of East Windsor, New Jersey, the Defendant issued to the Plaintiff an Individual Disability Income Policy No. 6031891. A copy of said Policy, together with all subsequent amendments, is attached hereto collectively as **Exhibit A**. This individual Policy insured the Plaintiff against total disability, which is defined as follows:

> "Total Disability, or totally disabled, means that due to Injuries or Sickness:
>
> 1. You are not able to perform the substantial and material duties of your occupation;
> 2. You are not working in any gainful occupation; and
> 3. You are receiving the care of a physician which is appropriate for the condition causing your disability. We will waive this requirement when continued care would be of no benefit to you." (**Exhibit A**).

6.      The Policy provides for a change in the definition of total disability when the Plaintiff reaches age 55:

> "After you attain age 55, or after benefits have been paid for ten years for a period of disability, whichever is later, Total Disability or Totally Disabled means that due to Injuries or Sickness:
>
> 1. You are not able to engage in any gainful occupation in which you might reasonably be expected to engage because of

2

education, training or experience, with due regard to your vocation and earnings at the start of disability; and

2. You are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you." (**Exhibit A**).

7. Prior to the onset of her disability in 2001, Ms. Sanders was a licensed optician in the states of New York and New Jersey. In this capacity, Ms. Sanders owned and operated two retail optical locations in New Jersey.

8. In her work as a licensed optician and retail business owner, Ms. Sanders was required to be on her feet for eight to ten hours consistently per day. On any given day Ms. Sanders was constantly moving about throughout the stores. She was responsible for selling and dispensing glasses, which required hours of sitting, standing and walking throughout the showrooms. She was also responsible for fitting glasses on customers, which required continuous physical movement and exertion, including constant sitting, standing, walking, leaning, crouching, twisting, bending, stooping, kneeling and turning. These movements would often need to be repeated and alternated hundreds of times per day on a busy day.

9. Ms. Sanders first became disabled on or about May 14, 2001 while she was approximately four months pregnant with her second child. She had been suffering from chronic severe pubic pain and other pregnancy-related complications, and she originally attributed the pubic pain to her pregnancy, assuming that this condition would resolve itself upon giving birth.

10. Ms. Sanders' pubic pain made it extremely difficult for her to sit, stand or walk for extended periods of time. Any attempt at significant physical activity resulted in worsening pain symptoms. It became impossible for her to twist, bend, kneel or stoop in any manner without experiencing severe pain throughout her pubic region.

11.     Ms. Sanders first consulted with her family physician, Dr. Anil Maheshwari, regarding her chronic pubic pain on February 26, 2002. At that time, Dr. Maheshwari diagnosed Ms. Sanders with strain of the pubic symphysis. In April 2002, Ms. Sanders continued seeing no improvement in her pain symptoms, and Dr. Maheshwari changed his diagnosis to osteitis pubis along with pubic strain. Osteitis pubis is an inflammation of the pubic symphysis and surrounding muscle insertions[1]. The pubic symphysis is the midline cartilaginous joint located between the left and right pubic bones[2].

12.     Upon diagnosis of osteitis pubis, Dr. Maheshwari asserted that Ms. Sanders' was totally disabled and advised Ms. Sanders to refrain from working.

13.     In the last 15 years since having been diagnosed with osteitis pubis, Ms. Sanders' pain symptoms have gradually worsened, despite numerous medical treatments including physical therapy.

14.      Ms. Sanders has also been subsequently diagnosed with bilateral trochanteric bursitis, which causes constant and severe pain in both of her hips. Bilateral trochanteric bursitis is an inflammation of the bursa in both of the hips, which are fluid-filled sacs that serve as cushions between bones and soft tissues such muscles, tendons, and skin[3].

15.     In 2003, Ms. Sanders began treating with an orthopedist named Dr. David Bullek, who has continuously supported Ms. Sanders' total and permanent disability. In 2004, at Dr. Bullek's suggestion, Ms. Sanders began aqua-therapy treatment, which is the only treatment which provides even minimal relief from Ms. Sanders' constant pain symptoms.

16.     Ms. Sanders continues to live in constant pain as a result of her diagnoses of osteitis pubis and bilateral trochanteric bursitis. She is unable to tolerate heavy pain medication,

---

[1] https://emedicine.medscape.com/article/87420-overview
[2] https://www.healthline.com/human-body-maps/pubic-symphysis
[3] https://www.webmd.com/pain-management/trochanteric-bursitis#1

and she is no longer able to even take over-the-counter pain medications, such as Aleve, due to severe damage done to her kidneys as a result of taking such medications several times a day for many years.

17.     Her doctors, including Dr. Bullek and Dr. Maria Garcia (her current primary care physician), are in agreement that she is totally disabled from working in any occupation, even a sedentary one.

## PLAINTIFF'S CLAIM FOR DISABILITY BENEFITS

18.     On June 14, 2001, Ms. Sanders filed a claim for disability income benefits under the terms of the Policy. She was experiencing complications from her pregnancy as well as severe pubic pain, and she made Unum fully aware that she was disabled for both of these reasons.

19.     Her disability claim was first supported by Dr. Maheshwari as well as Dr. David Idank, a physician with whom she was treating at the time.

20.     Following receipt of this claim, Unum delayed approving or denying the claim until November 26, 2002, when Unum sent Ms. Sanders a letter stating that benefit payments will be made to her under a reservation of rights. Ms. Sanders received benefits back-dated to February 26, 2002, the date which she was first treated for her pubic pain symptoms.

21.     In May 2003, Ms. Sanders was found to be disabled by the New Jersey Department of Labor.

22.     In June 2005, Ms. Sanders was approved for Social Security Disability benefits, and the Social Security Administration found that she had become totally disabled on May 15, 2001 as a result of osteitis pubis. Since this time, the Social Security Administration has reviewed Ms. Sanders' claim and has re-affirmed her total disability.

23.     On April 21, 2011, Unum sent Ms. Sanders a letter which clarified that while she had initially been approved for benefits under a "reservation of rights", that designation had been previously removed and Unum accepted full liability for Ms. Sanders' disability benefits.

### DEFENDANT'S TERMINATION OF PLAINTIFF'S BENEFITS

24.     Beginning around May 2016, Unum conducted a review of Ms. Sanders' disability claim due to the change in definition of "disability" under the terms of the Policy, given that Ms. Sanders was turning 55 years old.

25.     As part of this review, Unum conducted surveillance of Ms. Sanders on numerous occasions, including May 30, 2016, May 31, 2016, and several times between November 2016 and March 2017 while Ms. Sanders was in the United States. Unum also surveilled Ms. Sanders while she was in Israel.

26.     Unum then scheduled Ms. Sanders for an Independent Medical Examination with Dr. Herman Ambris, a pain management specialist, on April 6, 2017.

27.     The examination and subsequent report by Dr. Ambris were biased and misleading. Ms. Sanders was physically unable to complete many of the tasks requested during the evaluation, yet the report made no such mention of these failed tasks. Furthermore, Dr. Ambris refused to review the recent MRI and CT scans which were brought to his office by Ms. Sanders, and which objectively show severe degeneration to Ms. Sanders' pubic symphysis. Dr. Ambris told Ms. Sanders that he did not know how to interpret these diagnostic scans.

28.      Dr. Ambris summarily concluded based on his deficient examination that Plaintiff could return to work in her previous occupation as an optician. This was the first time in 15 years that any doctor evaluating Ms. Sanders concluded that she was not totally disabled.

29.     On the basis of Dr. Ambris' examination, Unum sent Ms. Sanders a letter dated April 28, 2017, which terminated her benefits effective the same day.

30.     On October 20, 2017, Ms. Sanders submitted an appeal letter in which she explained that her condition has not improved since the beginning of her claim. In fact, given the degenerative nature of osteitis pubis, her symptoms have actually worsened significantly over the last 15 years, and she therefore remains disabled under the terms of the Policy.

31.     On November 21, 2017, Unum rejected Ms. Sanders' appeal and affirmed its decision to terminate her benefits effective April 28, 2017.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S TERMINATION OF BENEFITS**

32.     Unum's asserted basis for termination of benefits is erroneous. Unum's reviewers disregarded both the overwhelming objective medical evidence in support of Ms. Sanders' disabling symptoms, as well as Ms. Sanders' own subjective complaints that she suffers from constant and severe pain which is exacerbated by even a slight amount of physical exertion.

33.     The disabling symptoms of Ms. Sanders' osteitis pubis have not improved since the onset of her disability in 2001, and in fact, they have significantly worsened. Further, Ms. Sanders now also suffers from bilateral trochanteric bursitis. Ms. Sanders' symptoms continue to disable her. As a result of these symptoms, Ms. Sanders cannot perform the material duties of any occupation and is therefore totally disabled under the terms of the Policy. Ms. Sanders' treating providers continue to support total disability from any occupation as a result of her osteitis pubis and bilateral trochanteric bursitis symptoms.

**AS AND FOR A FIRST CAUSE OF ACTION**

34.     Plaintiff repeats and re-alleges each and every allegation set forth above at paragraphs 1-33, as if fully set forth again herein.

35.     By virtue of the foregoing, the Defendant has breached its contract with the Plaintiff causing Plaintiff harm and damages.

## AS AND FOR A SECOND CAUSE OF ACTION

36.    Plaintiff repeats and re-alleges each and every allegation set forth above at paragraphs 1-35, as if fully set forth again herein.

37.    By virtue of the foregoing, Defendant has breached its duty of good faith and fair dealing, and has acted in bad faith, thereby damaging the Plaintiff.

## AS AND FOR A THIRD CAUSE OF ACTION

38.    Plaintiff repeats and re-alleges each and every allegation set forth above at paragraphs 1-37, as if fully set forth again herein.

39.    By virtue of the foregoing, Defendant's conduct violated the New Jersey Consumer Fraud Act, N.J.S.A. 56.8-2 *et seq.*

40.    This conduct includes, but is not limited to:

      a.    Failing and refusing to honestly interpret and apply the terms of its policy, so as to provide benefits to its insured as legally required;

      b.    Relying on false, fraudulent, deceptive medical evidence to justify denial of benefits, and ignoring all other evidence which required payment of such benefits;

      c.    Ignoring the findings of disability by SSDI even though the definition of disability applied by SSDI is more stringent then the definition provided for in the Defendant's policy;

      d.    Selling the need for "security" and "safety" and "protection" to the general public in order to induce purchase of its insurance products, knowing full well that its business model and profit-making priorities were inconsistent with, and likely to preclude "security", "safety" or "protection";

e.     Systematically exploiting older disabled individuals, by denying benefits to such individuals, when they are physically and financially vulnerable and diminished, and otherwise limited in their ability to enforce their rights under the policies which they purchased from the Defendant in good faith, and upon which they had dutifully paid substantial premiums, over many years;

f.     Engaging in a myriad of other unfair and deceptive claims handling practices, designed to deny benefits rightfully due to its insureds, and defeating the reasonable expectations of its insureds.

41.    These deceptive and unfair claims practices go beyond "a private contract dispute as to policy coverage" and constitute "consumer oriented conduct" involving a standard-issued policy, marketed, sold and available to all consumers in New Jersey.  As such, these unfair and deceptive claims handling practices are aimed not just at Plaintiff, but at other policy holders in New Jersey, and therefore have a broader impact on New Jersey consumers at large.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of the Plaintiff and against the Defendant as follows:

(a)    On the First Cause of Action:

(i)    Ordering, adjudging and decreeing that Plaintiff is disabled within the meaning of the said policy attached as **Exhibit A** hereto;

(ii)    Granting to Plaintiff all compensatory damages plus applicable interest due under the terms of the said policy attached as **Exhibit A** hereto;

(iii)    Granting to Plaintiff her costs of suit, including reasonable attorney's fees.

(b)    On the Second Cause of Action:

9

(i)     Ordering, adjudging and decreeing that Plaintiff is disabled within the meaning of the said policy attached as **Exhibit A** hereto;

(ii)    Granting to Plaintiff all compensatory damages plus applicable interest due under the terms of the said policy attached as **Exhibit A** hereto;

(iii)   Granting to Plaintiff extra contractual damages for Defendant's violation of the covenant of good faith and fair dealing;

(iv)    Granting to Plaintiff her costs of suit, including reasonable attorney's fees.

(c)     On the Third Cause of Action:

(i) Ordering, adjudging and decreeing that Plaintiff is disabled within the meaning of the said policy attached as **Exhibit A** hereto;

(ii) Granting to Plaintiff all compensatory damages plus applicable interest due under the terms of the said policy attached as **Exhibit A** hereto;

(iii)   Granting to Plaintiff treble damages; and

(iv)    Granting to Plaintiff her costs of suit, including reasonable attorney's fees.

USCHER QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
Phone  201-342-7100
Fax      201-342-1810


Dated:  January 10, 2018          By:    /s/Michael E. Quiat_____
                                         MICHAEL E. QUIAT
                                         Atty ID No. 015911985
                                         ***Attorney for Plaintiff, Caryn Sanders***

## **CERTIFICATION**

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action.

USCHER QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
Phone  201-342-7100
Fax      201-342-1810

Dated:  January 10, 2018          By:     /s/Michael E. Quiat
                                          MICHAEL E. QUIAT
                                          Atty ID No. 015911985
                                          ***Attorney for Plaintiff, Caryn Sanders***

*G:\Disability\Sanders, Caryn\Complaint - Unum.docx*

*JDZ*